1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SAMUEL N. BROWN,

11          Petitioner,              No. CIV S-03-1965 FCD KJM P

12      vs.

13   JAMES E. HALL, Warden,

14          Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  He challenges his Sacramento County convictions for

18   attempted murder and mayhem, the findings that he had used a gun and inflicted great bodily

19   injury, and the resulting sentence of thirteen years, followed by a term of life with the possibility

20   of parole.

21   I.  Background

22          Although petitioner challenges one aspect of the sufficiency of the evidence, the

23   state Court of Appeal's account of the facts as developed at trial reflects this court's reading of

24   the factual underpinning of this case.  The aspect of the case that petitioner challenges as

25   /////

26   /////

1

insufficient will be discussed in more detail below.  The appellate court's factual summary is as follows:

> *Prosecution case in chief*
>
> Defendant and victim Alfred Moore had been neighbors for about five years.  On February 15, 1997, they got into a heated argument outside Moore's house.  The argument escalated into a fistfight, with Moore chasing defendant to a nearby bridge.  When defendant stopped, he pulled out a .38-caliber handgun from his pocket, pointed it at Moore and said "I ought to shoot you and your bitch."  Moore went home and took a shower.  His fiancée, Hattie Turner, had seen the fight and had called the police.  Later, when Turner asked Moore why he was nervous and shaking, he answered, "Anytime somebody pull[s] a gun in your face and you have to look down the barrel of a gun, you feel the same way I feel."
>
> More than a month later, on March 24, 1997, at about 4:30 or 5:00 p.m., some of defendant's friends were outside of Moore's house in a red car.  Defendant drove up in a gray car.  When he stepped out, someone handed him a shotgun, which he placed in the trunk of the red car.
>
> Around 2:30 a.m. the next morning, Moore prepared to leave for work as a trucker.  While feeding his dog outside his house, he briefly activated the motion light, which went out after he finished.  Shortly thereafter, the light came back on, and the dog barked and ran up against the fence.  Moore looked to see what was happening.  Across the levee, he saw defendant running toward the bridge and G Parkway, using both hands to hold a shotgun across his chest.  The light illuminated defendant's face.  Moore returned to his house to get his logbook, keys and gun.  Although he twice returned . . . for the gun, he forgot to take it with him.  When Moore approached his truck, he saw defendant on the ground in front of the truck.  Moore touched defendant on the shoulder and said, "Sam, what are you doing?"  Defendant got up, turned his back to Moore, and covered his face with a mask that had been on the top of his head.  As Moore backed into his garage, defendant shot him in the left shoulder area, above the breast.  Defendant next shot Moore in the face.  When Turner found Moore in the garage, he told her, "Call the police.  Sam Brown just shot me."
>
> Sacramento Police Officer Norman Leong arrived at Moore's residence at approximately 3:08 a.m.  Thinking that Moore would die, Leong asked Moore who did the shooting.  Moore responded, "Sam did it." [fn]  He added that Sam's last name was Brown, and that Sam was his neighbor from across the street.  He described Sam as a Black male, around six feet tall, thin and wearing a black mask, black pants and a black shirt. [fn]

[fn] After Moore told Leong that Sam did it, he said "I think it was Sam," because of the shooter's size.  Moore told Leong that the shooter had walked up to him and shot him without saying anything; Moore then added, "I think the suspect was Sam." Moore had not told Leong about the motion light illuminating Sam's face.

[fn] At trial, Moore described the shooter as "a heavy guy, big guy."  Moore stated that defendant was heavier in the chest than he was at the time of the shooting.

Moore communicated with police in April, while in a trauma nursing unit, and in July, after being released from the hospital. Moore consistently told police that defendant was the shooter, and that he wore a black T-shirt with a white "X" on it.  At the time of the shooting, he did not have any arguments or feuds with anyone but defendant.

Defendant was apprehended in New Orleans in November 1997, and was thereafter brought back to Sacramento.

*Defense*

Detective Joseph Sledge testified that he spoke with Moore on April 1, 1997, while Moore was medicated and connected to intravenous tubes.  Moore had not mentioned seeing the shooter's face before the shooter pulled down his mask.  However, Moore did mention that he had called the shooter's name, saying, "Sam, I know that's you."  Moore positively identified the shooter as defendant, and said that he was wearing a black T-shirt with a white "X" on it.

Detective Jeffrey Gardner testified that he conducted a taped interview with Moore on July 9, 1997.  Moore told Gardner that he had never before seen defendant with a gun like the one defendant used against him.

The defense rested, and then reopened its case to allow defendant to testify on his own behalf.

Defendant testified that he and Moore did not get into a fistfight in February 1997.  Instead, Moore had pulled a knife on him and had tried to stab him.  Defendant said that he did not have a gun, that he ran off, and that Moore had chased him.  Defendant said he never owned a mask, a shotgun or a shirt with an "X" on it, and that he did not shoot Moore.

/////

/////

/////

3

Defendant testified that he was with his friends, Willie Jones and Donovin Randolph, at Jones's house from 6:30 p.m. on March 24, 1997, through the next morning. Defendant went to New Orleans on March 30, 1997, to further his music career. At the time, he did not know that there was an arrest warrant for him or that he was a suspect in Moore's shooting.

On cross-examination, defendant admitted that in February 1997 he had access to a .38-caliber revolver. He admitted getting "picked up" by police for possessing a gun in California, a misdemeanor offense. [fn. omitted]. He also admitted he "took the charge for a gun-related incident in New Orleans in which he used a false name.

The defense again rested and then reopened its case, to present testimony from Willie Jones and Donovin Randolph. Jones testified that around mid-evening on March 24, 1997, he picked up defendant at his home and brought him to Jones's residence on T Street. Defendant stayed overnight and left at 8:00 a.m. the next day. They had lifted weights and watched "porno flicks."

On cross-examination, Jones admitted sending a letter to defendant while defendant was in jail. Jones admitted stating in the letter that he did not remember what had happened in 1996 and 1997. Jones acknowledged that defendant had written him back, and that defendant had stated that they had been lifting weights and watching videotapes on the night of the shooting.

Jones testified that he first heard that defendant was suspected of shooting Moore in March 1998. However, Jones did not call the police or the district attorney's office to tell them that defendant had been with him on the night of the shooting.

Randolph testified that he learned of the shooting of Moore from defendant while he and defendant were at Jones's apartment. A few hours after they arrived, defendant received a telephone call and thereafter he told Randolph about the shooting. Randolph, however, could not recall what date this event occurred. Following the telephone call, he and defendant stayed at Jones's place overnight and left the next morning.

*Rebuttal*

Officer Vonda Walker testified that on February 12, 1997, she searched defendant's bedroom and found two live 20-gauge shotgun rounds and one live nine-millimeter round in the closet.

/////

/////

/////

4

> Detective Gardner testified that he interviewed defendant in New Orleans.  Defendant stated he had left Sacramento because officers had been to his home and he heard that police were looking for him.  Defendant denied shooting Moore.  On March 28, 1997, Gardner searched defendant's residence and found a live shotgun round.

Answer, Ex. 4 at 2-7.

II. AEDPA Standards

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to

---

[1] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

1  address the merits of a particular claim, but may simply deny a habeas application on the ground

2  that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

3  Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

4  courts to review state court decisions for error before determining whether relief is precluded by

5  § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

6  by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

7          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

8  different.  As the Supreme Court has explained:

9          A federal habeas court may issue the writ under the "contrary to"
        clause if the state court applies a rule different from the governing
10         law set forth in our cases, or if it decides a case differently than we
        have done on a set of materially indistinguishable facts.  The court
11         may grant relief under the "unreasonable application" clause if the
        state court correctly identifies the governing legal principle from
12         our decisions but unreasonably applies it to the facts of the
        particular case.  The focus of the latter inquiry is on whether the
13         state court's application of clearly established federal law is
        objectively unreasonable, and we stressed in Williams [v. Taylor,
14         529 U.S. 362 (2000)] that an unreasonable application is different
        from an incorrect one.

15

16  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

17  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

18  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

19  (2002).

20          The court will look to the last reasoned state court decision in determining

21  whether the law applied to a particular claim by the state courts was contrary to the law set forth

22  in the cases of the United States Supreme Court or whether an unreasonable application of such

23  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

24  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

25  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

26  must perform an independent review of the record to ascertain whether the state court decision

1  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

2  words, the court assumes the state court applied the correct law, and analyzes whether the

3  decision of the state court was based on an objectively unreasonable application of that law.

4          It is appropriate to look to lower federal court decisions to determine what law has

5  been "clearly established" by the Supreme Court and the reasonableness of a particular

6  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

7  III.  Ineffective Assistance Of Counsel (Petition–Ground Three)

8          A.  Background.

9          At the close of the prosecution's case, defense counsel Joel Deckler made a

10  motion for an acquittal based on insufficient evidence, relying on California Penal Code

11  § 1118.1.  RT 219.  After the court denied the motion and before the jury returned, Deckler told

12  the court he had discussed with petitioner his right to testify and asked petitioner, on the record,

13  whether he intended to exercise that right.  Petitioner said no.  RT 221.  Deckler then said the

14  defense would rest.  Id.  When the jury returned, Deckler again said the defense rested.  Id.  The

15  court told the jurors they had heard all the evidence and sent them home for the evening.  RT

16  222.

17          After the parties reviewed the exhibits, the judge returned to the courtroom and

18  told Deckler that as petitioner was being taken out of the courthouse, he saw the judge and said

19  he wanted to put something on the record.  Deckler consulted petitioner and then told the judge

20  petitioner "might want to change his mind about testifying," and added that petitioner's decision

21  was against Deckler's "strong advice."  RT 226.

22          When the jury returned the next morning, the judge told them, "I know I spoke

23  yesterday about the evidence had concluded. [sic]  That is not the case.  We're going to hear

24  some more evidence this morning."  RT 230.

25          After petitioner testified, saying that he had been with Willie Jones and Donovin

26  Randolph at the time of the shooting, RT 249, Deckler once again said that the defense rested.

1   RT 258.  The prosecutor asked for a continuance to secure his rebuttal witnesses, which the court

2   granted.  RT 260-261.

3          When they returned, the parties had a conference at the bench and the court then

4   granted the defense motion to reopen, on the record.  RT 265.  Deckler then called Jones and

5   Randolph.  RT 265-282.

6          After the verdicts were returned, petitioner retained new counsel for the purpose

7   of preparing a motion for a new trial based on ineffective assistance of trial counsel, Joel

8   Deckler.  RT 411-412; CT 52-225 (motion).

9          At the hearing on the motion Deckler testified that petitioner told him Jones and

10  Randolph could provide an alibi for petitioner, so Deckler gave the names, along with the names

11  of other potential witnesses, to Cerrito, his investigator.  RT 566, 591, 592.  According to

12  Cerrito, Deckler did not give her the specific assignment to look for Jones and Randolph, but she

13  attempted to do so.  RT 604.  Because she did not have a good address for either of them, Cerrito

14  consulted directories in an attempt to find them.  She also asked petitioner's mother, Betty

15  Brown, for any additional information that would help her locate Jones and Randolph.  RT 553,

16  605.  She reported to Deckler that she was not successful in her attempts.  RT 606.  According to

17  petitioner, however, Deckler said he would subpoena Randolph and Jones, and shortly before

18  trial assured petitioner he had taken care of everything.  RT 560.  According to Deckler, once he

19  became aware that Cerrito could not find Jones and Randolph, he did not give her subpoenas to

20  serve on them before trial started.  RT 570, 572.

21         Deckler did not mention the alibi witnesses in his opening statement because he

22  was not sure they were going to be called as witnesses and because of the exchange of letters

23  between Jones and petitioner about the alibi.  RT 580.  Indeed, he was aware before trial started

24  that investigator Cerrito had not been able to locate them.  RT 585.  Moreover, because of the

25  exchange of letters between Jones and petitioner, Deckler had "mixed feelings" about putting

26  Jones on the stand.  RT 580.  Once petitioner had testified he was with Jones, Deckler felt he had

8

1   to call Jones as a witness.  RT 581-582.  He then "redouble[d] his efforts" to find Jones and

2   Randolph and so sent Cerrito to the jail to get additional information from petitioner.  RT 577.

3   Betty Brown was able to provide Cerrito with the name of another of petitioner's friends, who

4   was able to put Cerrito in touch with Jones and Randolph.  RT 556.  Jones and Randolph both

5   said they were not aware that anyone was looking for them until Cerrito subpoenaed Jones and

6   petitioner's friend told Randolph to show up during the trial. RT 534, 547.

7           Deckler spoke to Jones and Randolph in the hall outside the courtroom for five to

8   fifteen minutes before he called them as witnesses.  RT 530, 539, 548, 578-579.  He did not

9   discuss the letters with Jones.  RT 582.

10          Deckler conceded that he told the court he had never heard of the alibi witnesses

11  until petitioner testified, saying it was because he "goofed."  RT 574.

12          Randolph's testimony at the hearing on the motion for a new trial was somewhat

13  stronger than his testimony at trial: he said he was with petitioner continuously from the evening

14  of March 24, 1997, through the afternoon of the next day.  RT 531.[2]

15          Deckler was aware that Moore had told Sledge that he knew the shooter was

16  petitioner in part because he walked with a limp; petitioner told Deckler he had never walked

17  with a limp.  RT 563, 567.  Deckler questioned petitioner's family, who confirmed that petitioner

18  had never walked with a limp.  RT 567.  He did not question petitioner about this:

19              Because I thought it would be severely damaging to Mr. Brown's
                defense to elicit . . . the specific trait that hasn't been ascribed to
20              Mr. Brown up until that point in the trial . . . .

21   RT 568.  He did not call petitioner's family to testify about this because he was not sure the jury

22  would credit their testimony, so "there was no conclusive way to prove whether or not at the time

23  of the shooting, Mr. Brown had a limp."  RT 568-569.  Neither petitioner nor his family provided

24  the names of other witnesses who could testify that petitioner did not walk with a limp during the

25  _____

26          [2]  Randolph did not independently remember the date, but agreed with counsel that if
        March 24-25, 1997, were the dates at issue, he had been with petitioner.

9

1  relevant time period.  RT 569.  At the hearing on the motion for a new trial, Jones said he had

2  never known petitioner to walk with a limp, but Deckler had never asked him about this.  RT

3  540.

4           As an exhibit to his reply to respondent's answer, petitioner has presented a letter

5  from Kaiser Permanente Medical Group, which lists the conditions for which he was treated

6  from 1991 through 1996; it says nothing about a knee injury.  Traverse, Ex. 6.  It does not appear

7  that this letter was presented to the trial court during the hearing on the new trial motion.

8           The trial court denied the motion for a new trial.  The court recognized that the

9  essence of the alibi was presented to the jury, but agreed with counsel that it needed to examine

10  whether petitioner was prejudiced "in the manner in which it was put forward," particularly the

11  fact that there was "[r]eal truly not much preparation prior to [Jones and Randolph] being put on

12  the stand."  RT 631, 633.  The court observed:

13           Today, when both of these witnesses testified, again, it was very
             obvious to the Court there's some credibility issues regarding these
14           witnesses [sic] testimony, demeanor that they exhibited, the way
             they answered questions.
15
             But the bottom line is, is that that didn't offer any new evidence,
16           anything different than what they testified to at the trial.  Nothing
             new.  So that indicates to the Court that the full extent of their
17           testimony had been presented to the jurors.

18           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

19           I agree with Mr. Masuda that perhaps the way [Deckler presented
             the alibi] was not a way that indicates the best possible preparation
20           and the best possible defense, but I can't find that the way or the
             manner or the actual evidence that was presented is, in fact,
21           inadequate or shows that Mr. Deckler is incompetent.[3]

22  RT 633-634.

23  _____

24      [3]  Petitioner quotes the trial court as finding that the defense was prejudiced "in the way
    that the manner in which this evidence was put forward."  RT 633.  This court cannot determine
25  whether the trial court misspoke or whether the court reporter did not record the judge's
    comments accurately, but a finding of prejudice would not square with the court's ultimate
26  conclusion that trial counsel was not incompetent and its denial of the motion for a new trial
    based on client's incompetence.  RT 634.

Petitioner raised this issue on direct appeal, and it was resolved by the state

appellate court as follows:

> [A] conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted.  If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails.  In this context a "reasonable probability" is one "sufficient to undermine confidence in the outcome."  (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698].)

> In this case, defendant has not established either prong of ineffective assistance.  The record refutes his claim that trial counsel inadequately investigated the alibi defense.  Counsel was aware of the exchange of letters between defendant and Jones, in which Jones admitted that he could not recall the events surrounding the shooting and defendant responded by "telling Mr. Jones, this is my alibi.  This is what I want you to say."  Having discovered that the alibi was so vulnerable to impeachment, counsel was entitled to conclude that it would do more harm than good and that it should not be presented.  Defendant does not suggest what further investigation would have made the alibi appear less contrived or more credible.  No lack of investigation is shown.

> Nor was trial counsel deficient for having failed to explore the issue of defendant's limp.  Moore did not claim that the "past basketball injury" made defendant limp at all times; thus, defendant could have enjoyed periods in which his gait was unaffected.  As the trial court recognized, it would be virtually impossible to prove that defendant did not have even a temporary limp at the time of the shooting.  Nor does defendant contend that competent counsel could have produced such proof.  Because Moore did not claim that he saw defendant limp at any other time, or that defendant limped at all times, testimony by other persons who had observed him walking without a limp would not have rebutted Moore's testimony.

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> . . . [E]vidence that the prior injury did not cause defendant to limp during the days or weeks preceding the shooting would *not* have negated the possibility that it caused him to limp at the time Moore was shot.

Finally, trial counsel was not deficient for having twice reopened the defense case. As the trial court recognized, the first reopening was necessitated by defendant himself, who had indicated that he would not testify and then changed his mind over counsel's "strong advice." The second reopening was necessitated by defendant's testimony, which presented an alibi defense that named witnesses who were not immediately available to testify. Defendant does not contend that his investigator was deficient for having failed to find the alibi witnesses when first directed to do so. The evidence at the hearing suggests that the witnesses were produced within a reasonable period after the second request to search for them. A request for a continuance, as opposed to a rest and reopening, would not have materially altered the appearance of the defense case.

Defendant has not shown a reasonable probability that he was prejudiced by trial counsel's failure to present evidence of his alibi and his lack of a limp immediately following the prosecution case. The evidence against defendant was compelling and persuasive: he had a motive to shoot the victim, he was positively identified as the shooter, and his flight to New Orleans was evidence of his consciousness of guilt. On the other hand, his alibi defense was unconvincing for reasons having nothing to do with the manner in which it was presented. When defendant heard that the police were looking for him, he fled to New Orleans rather than mention his alibi. When he was interviewed in New Orleans, he did not tell the police about his alibi. His principal alibi witness, Jones, wrote in a letter that he had no recollection of events on the night of the shooting. In response, defendant sent Jones a letter setting forth the details of what would become his alibi. At trial, Jones purported to remember the details that he earlier had claimed to have forgotten; his "recollection" parroted the facts stated in defendant's letter. Moreover, evidence that defendant walked without a limp at some time prior to the shooting would not have shaken Moore's testimony that he had seen defendant every day for five years, that he saw defendant running with a shotgun, and that he saw defendant's face just before defendant shot him.

Answer, Ex. 4 at 9-13 (citations, footnote omitted).

B. Standard

The federal law on claims of attorney ineffectiveness is clear: First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be

1    whether counsel's assistance was reasonable considering all the circumstances." Id. at 688.  A

2    court must "indulge a strong presumption" that counsel's conduct falls within the range of

3    competence.  Iaea v. Sunn, 800 F.2d 861, 864 (9th Cir. 1986).  Accordingly, this court must

4    determine whether in light of all the circumstances, the identified acts or omissions were outside

5    the wide range of professional competent assistance and a petitioner must overcome the

6    presumption that the act or omission might be an appropriate strategic decision.  Id. at 689, 690.

7           It also is petitioner's burden to establish prejudice:  "A defendant must show that

8    there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

9    proceeding would have been different.  A reasonable probability is a probability sufficient to

10   undermine confidence in the outcome." Strickland, 466 U.S. at 694.  A "verdict or conclusion

11   only weakly supported by the record is more likely to have been affected by errors than one with

12   overwhelming record support." Strickland, 466 U.S. at 696.  When the prosecution's case is

13   weak, therefore, the "potential prejudicial impact of counsel's performance must be evaluated in

14   light of that fact." Johnson v. Baldwin, 114 F.3d 835, 838 (9th Cir. 1997).

15          C.  The Failure To Investigate The Alibi

16          One of counsel's duties is investigation, but "the duty to investigate and prepare a

17   defense is not limitless:  it does not necessarily require that every conceivable witness be

18   interviewed." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (internal quotations,

19   citations omitted), amended on denial of rehearing, 253 F.3d 1150 (9th Cir. 2001).

20              [C]ounsel has a duty to make reasonable investigations or to make
                a reasonable decision that makes particular investigations
21              unnecessary.  In any ineffectiveness case, a particular decision not
                to investigate must be directly assessed for reasonableness in all
22              the circumstances, applying a heavy measure of deference to
                counsel's judgments.
23

24   Strickland, 466 U.S. at 691.  As the Ninth Circuit has recognized, once defense counsel has made

25   a reasonable tactical decision to pursue one defense strategy, his obligation to investigate other

26   lines of defense is reduced or eliminated.  Turk v. White, 116 F.3d 1264, 1267 (9th Cir. 1997).

1    Deckler's pursuit of petitioner's alibi defense was not vigorous, to be sure, for he

2    did very little to locate Jones and Randolph after Cerrito's initial attempts to find them proved

3    fruitless.  Nevertheless, his "mixed feelings" about presenting the alibi in light of the exchange of

4    letters between Jones and petitioner and the impact those letters would have on the defense[4] --

5    feelings grounded in the letters' clear import -- justified his decision not to pursue the

6    investigation into petitioner's alibi with more vigor.  See Lawson v. Caspari, 963 F.2d 1094,

7    1095 (8th Cir. 1992) (counsel's concern about "fudged" testimony from one of defendant's alibi

8    witnesses, among other things, justified counsel's decision not to present alibi).  As the state

9    Court of Appeal concluded, Deckler's decision to limit his investigation of petitioner's alibi was

10   reasonable in light of petitioner's letter, outlining the testimony ultimately presented by Jones

11   and Randolph.

12       Moreover, petitioner cannot demonstrate any prejudice from Deckler's decision

13   not to pursue the alibi before petitioner's own testimony changed his strategic approach to the

14   trial.  Although Deckler talked only briefly to Jones and Randolph before calling them as

15   witnesses, petitioner does not suggest what a lengthier interview would have produced.  See

16   Buckner v. Polk, 453 F.3d 195, 202 (4th Cir. 2006) (although strategy based on short preparation

17   time might show deficient performance of counsel, petitioner must still prove prejudice); Gattis

18   v. Snyder, 278 F.3d 222, 235-36 (3d Cir. 2002) (counsel did not inspect scene until trial was

19   under way and determined that inspection supported defendant's version, nevertheless, did not

20   present expert witness; no prejudice from tardy investigation because defendant testified and

21   _____

22       [4]  Although the letters themselves are not in the record, Deckler quoted from them in
     closing in order to emphasize petitioner's continued exhortation to Jones to tell the truth.   In his

23   letter, Jones told petitioner, in part, "I remember a lot what you talk about.  It's hard.  Me and
     DMK is still trying to find out what went down.  It's so long ago, and a lot of shit went down '96

24   and '97."  Petitioner's reply, in part, said "Well, today spoke to my private investigator. . . . I
     gave her my alibi, let her know that we (me, you, and DMK) was chilling at choe [sic] spot on T

25   and 11th, March '97 (the 24th).  I told her you picked me and DMK up from my house 6:00 p.m.
     that date, and we went back to your crib to spend the night, lifting weights and watching

26   videotapes. . . . That's it.  The truth.  I also told her that broad that stayed across the street from
     me paged me between 2:00 a.m. and 6:00 a.m. while I was at choe [sic] house."  RT 353-354.

1 expert could not have rebutted many points of prosecution's case).  Petitioner also does not

2 suggest how the credibility of the alibi defense could have been improved if Deckler had

3 interviewed Jones and Randolph months rather than minutes before putting them on the stand, in

4 light of the letter and petitioner's initial failure to mention his alibi to Gardner when he was

5 arrested in New Orleans.

6        Finally, this is unlike the case when counsel's strategic decision or unconsidered

7 action meant that the jury never heard a defense: the jury heard petitioner, Jones and Randolph

8 each describe the events of March 24, 1997.  Compare Clinkscale v. Carter, 375 F.3d 430 (6th

9 Cir. 2004) (counsel's failure timely to file notice of alibi caused court to exclude all but

10 defendant's alibi testimony; court found this was not effective assistance of counsel), cert.

11 denied, 543 U.S. 1177 (2005).  There was no prejudice.

12       D.  Reopening The Case

13        Petitioner argues that by reopening the case twice, Deckler presented the alibi

14 defense in a "disorderly, . . . unbelievable, freshly contrived fashion to the jury."  Pet.

15 (attachment page to ground three).  He suggests that his decision to testify, which led to the

16 initial reopening of the defense case, was prompted by Deckler's resting without presenting any

17 defense.  Id.

18        A defendant's right to testify is personal and may be relinquished only by him.

19 Brown v. Artuz, 124 F.3d 73, 77-78 (2d Cir. 1997) (recognizing circuit unanimity).  In this case,

20 it was petitioner's decision to testify, after he had informed court and counsel that he would not

21 take the stand, that prompted the initial reopening of the case.  This action, taken in response to

22 petitioner's wishes, does not constitute ineffective assistance of counsel.  See United States v.

23 Mullins, 315 F.3d 449 (5th Cir. 2002) (not ineffective assistance for counsel to accede to

24 defendant's wish to testify because it is the defendant's right).

25        This court is more uncomfortable than was the Court of Appeal with Deckler's

26 second determination to rest and then reopen; this contradicts his testimony at the post-verdict

15

1   hearing that once petitioner had named alibi witnesses during his testimony, Deckler felt he had

2   to produce those witnesses.  RT 580-582.  Nevertheless, the court cannot find the Court of

3   Appeal's decision was an unreasonable application of federal law because petitioner has not

4   demonstrated any prejudice from the manner in which counsel presented the defense.  The fact

5   that counsel twice reopened the case cannot make the defense seem any more "unbelievable" or

6   "contrived" than petitioner did through his letter to Jones.

7          E.  Failure To Present Evidence That Petitioner Did Not Limp

8                  Deckler examined Moore about his shifting descriptions of petitioner as his

9   assailant and questioned the officers who interviewed Moore about the differences in each of his

10  accounts of the crime.  See RT 125, 127, 147, 159, 192, 196, 212, 216.  Although Deckler was

11  aware that Moore had told Detective Sledge that the shooter limped in the same way petitioner

12  did and Deckler learned from petitioner's family that petitioner did not limp, he chose not to raise

13  this possible discrepancy because of the difficulties of proving a negative.  See RT 567-569;

14  Traverse, Ex. 3 (police report).

15                 As the Court of Appeal recognized, under clearly established federal law,

16  Deckler's decision is entitled to deference.  Strickland, 466 U.S. at 688.  In Mancuso v. Olivarez,

17  292 F.3d 939 (9th Cir. 2002), the habeas petitioner challenged his lawyer's determination not to

18  elicit testimony that two witnesses had been hypnotized and then to present evidence on the

19  unreliability of hypnotically-refreshed testimony; the lawyer believed that jurors would assume

20  such testimony to be particularly reliable.  Id. at 954.  The Ninth Circuit recognized that the

21  lawyer's decision was entitled to deference and said that "Mancuso's argument that his counsel

22  could have presented a better defense fails to overcome the strong presumption that counsel's

23  conduct fell within the range of reasonable professional assistance."  Id.  The court also said that

24  a "tactical decision by counsel with which the defendant disagrees cannot form the basis of a

25  claim of ineffective assistance of counsel."  Id. (quoting Guam v. Santos, 741 F.2d 1167, 1169

26  (9th Cir. 1984)).

1    This case is similar to <u>Mancuso</u>: counsel attacked Moore's identification of

2    petitioner on many fronts, but chose not to challenge Moore's description of petitioner with a

3    limp.  This was not a case in which counsel discounted potential testimony from petitioner's

4    family that would have supported his only defense, but rather a situation in which counsel made a

5    strategic decision not to focus on a physical characteristic that Moore had mentioned but that

6    might prove difficult to disprove.  <u>Compare</u> <u>Luna v. Cambra</u>, 306 F.3d 954, 962 (9th Cir.), <u>as</u>

7    <u>amended in</u> 311 F.3d 928 (9th Cir. 2002) (trial counsel erred in discounting testimony of family

8    members who could have corroborated defendant's only defense).

9    This court's analysis is not changed by the letter from Kaiser, which petitioner has

10   attached to his reply.  Although it does not include a knee injury among the conditions petitioner

11   had treated at Kaiser, the letter does not and cannot purport to be a definitive statement regarding

12   all of petitioner's medical conditions, however minor, and does not say that petitioner was treated

13   exclusively at Kaiser.

14   Based on this record, this court does not find the state Court of Appeal

15   unreasonably applied federal law on the effective assistance of counsel.

16   IV.  <u>Insufficiency Of The Evidence (Petition–Ground One)</u>

17   Petitioner argues that Moore's testimony is not worthy of belief beyond a

18   reasonable doubt because of the way in which his identification of petitioner changed and

19   became more certain as the police lost interest in pursuing petitioner as the shooter.  Pet. at 5

20   (attachment page to ground one).  Petitioner has attached police reports and transcripts of

21   Moore's interviews with the police to argue that Moore's identification became more definite and

22   assured when he learned that police might not seek a warrant for petitioner.

23   Petitioner raised this issue in the petition for a writ of habeas corpus he filed in the

24   California Supreme Court, which was denied without analysis.  Answer, Exs. 6 (petition) & 8

25   (order denying petition).

26   /////

1    In <u>Jackson v. Virginia</u>, the Supreme Court examined the role of a habeas court in

2   considering a challenge to the sufficiency of the evidence:

3         [T]he relevant question is whether, after viewing the evidence in
          the light most favorable to the prosecution, *any* rational trier of fact
4         could have found the essential elements of the crime beyond a
          reasonable doubt.

5

6   443 U.S. 307, 319 (1979) (emphasis in original).

7    The court continued:

8         [A] federal habeas corpus court faced with a record of historical
          facts that supports conflicting inferences must presume – even if it
9         does not affirmatively appear in the record – that the trier of fact
          resolved any such conflicts in favor of the prosecution, and must
10        defer to that resolution.

11  <u>Id</u>. at 326.  Constitutionally sufficient evidence need not rule out every hypothesis except that of

12  guilt.  <u>Id</u>.  The trier of fact's credibility determination in this case is entitled to near total

13  deference under <u>Jackson</u>.  <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004).

14    Alfred Moore testified that during the early morning hours of March 25, 1997, he

15  went outside to feed his dog on his way to work when his motion light went on.  RT 84-87.  He

16  looked across to the levee and saw petitioner running with a shotgun across his chest.  RT 88,

17  103, 112.  Moore returned to house and when he came back outside, he saw petitioner on all

18  fours by the front of Moore's truck.  RT 90.  Moore walked over, touched petitioner on the

19  shoulder, and asked what he was doing there.  RT 91, 107.  Petitioner stood up, pulled a ski mask

20  from the top of his head over his face and shot Moore.  RT 91.  Moore recognized petitioner's

21  build, tall and heavy; he had known petitioner as a neighbor for five years.  RT 78, 98.  Moore

22  conceded that he had not told the officers who interviewed him that he had seen petitioner with a

23  shotgun twelve hours before the shooting.  RT 123.

24    Moore said his earlier descriptions of the incident were sketchy, but as he healed,

25  he began to remember additional details.  RT 99-100.  He told the jury he was positive petitioner

26  had shot him.  RT 101.

When Sacramento police officer Norman Leong arrived at the crime scene during the early morning hours of March 25, 1997, he believed Moore was going to die and so asked him "who did the crime." RT 151. Moore said, "Sam did it," and identified Sam as his neighbor from across the street, whose last name was Brown. RT 152; <u>see also</u> Traverse, Ex. 1 (Leong's police report, which says in part, "Sam did this to me. I think it was Sam because of his size.") Moore told Leong that the assailant was tall and thin and had been wearing "beanie-type cap with holes in it," and black clothing. RT 153. Moore did not tell Leong that he saw the shooter's face when his motion light came on. RT 159.

Sacramento police detective Joseph Sledge interviewed Moore on April 1, while Moore was still in the hospital. RT 215. Moore did not tell him he had seen the shooter's face before the shooter had pulled the mask down. RT 216. Moore did say, however, that the shooter was kneeling by his truck and that Moore called out, "Sam, I know that's you." RT 217; <u>see also</u> Traverse, Ex. 3 (police report; Moore told Sledge he recognized the shooter as Sam, in part because of the way he moved; shooter was wearing black clothing and a mask; shooter has a thin build; Sam and shooter both walked with a limp; he had seen Sam with a similar ski mask some months before; shooter was wearing a tee shirt with an "X" on it, similar to one he had seen Sam wearing).

On April 9, 1997, Sledge went to Moore's house and told him that no warrant had been issued for petitioner, but that the case was still open. RT 212, 214.

Sacramento police detective Jeffrey Gardner interviewed Moore by telephone on July 9, 1997, after Moore's girlfriend, Hattie Turner, told Gardner that Moore had remembered additional details about the shooting. RT 190. Moore told him that he had first seen petitioner at the corner of his yard, running toward the front of Moore's truck and then he saw petitioner kneeling in front of his truck. RT 194. Moore told Gardner he said, "Sam, what are you doing here?," and was able to see petitioner because his motion light had come on. RT 194, 196. It was only then that petitioner had pulled the ski mask down. RT 195. Moore also told Gardner

that he had just recently remembered that petitioner had been wearing a black shirt with an "X" on it.  RT 195.  Toward the end of the interview, Gardner told Moore he would send this information to the district attorney's office so they could reevaluate the case.  RT 192.  Moore said, "I thought it was all over with because they said it - - with a mask."  RT 192.  <u>See also</u> Traverse, Ex. 4 (police report; Moore told Gardner that when he was first shot, he remembered the officer asking how he knew it was Sam under the ski mask and that he now remembered that he saw Sam when the motion light came on, before Sam had pulled the ski mask down and that he had seen Sam running with the shotgun) & Ex. 5 (transcript of Gardner/Moore interview).

Although there were inconsistencies in Moore's testimony and the several accounts of the shooting he gave to the police, he was steadfast throughout in identifying petitioner as the shooter.  There is nothing irrational about the jury resolving the inconsistencies in favor of the prosecution, particularly in light of Moore's very first statement to Leong that "Sam did it."  The evidence that petitioner was the shooter is sufficient.

V.  <u>Prosecution Presentation Of Perjured Testimony (Petition, Ground Two and Five)</u>

Petitioner argues even though Moore's identification of the shooter changed every time he talked to the police, the prosecution countenanced Moore's false claim that he had told every officer he had seen the shooter's face and thus was able to identify him as petitioner.  Pet. at 5 (and attachment page regarding ground two).

During cross-examination, Deckler asked Moore:

Q: Isn't – sir, isn't it true you never told the responding officer that you saw the man's face?

A: I saw Sam's face with the shotgun.

Q: You are saying you told the responding officer that you saw Sam Brown's face?

A.  Yes.

RT 135.  Leong testified, in contrast, that Moore did not say he saw the shooter's face when his motion light came on.  RT 159.

1    Petitioner also argues that the prosecutor presented Gardner's false testimony that

2  during a probation search of petitioner's room several days after the shooting, he found a live

3  shotgun shell, when in fact he had made no police report about the incident nor logged the shell

4  into evidence.  Pet. (attached pages regarding ground five).

5    A conviction violates the Fourteenth Amendment if it is obtained by the use of

6  perjured testimony the prosecutor knows to be false.  Napue v. Illinois, 360 U.S. 264 (1959).  It is

7  petitioner's burden to demonstrate that the challenged testimony was false, that the false

8  testimony was material, and that the prosecutor knew the testimony was false when it was

9  presented.  Chambers v. Johnson, 218 F.3d 360, 363-64 (5th Cir. 2000).  A witness "gives false

10 testimony concerning a material matter with the willful intent to provide false testimony, rather

11 than as a result of confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S.

12 87, 94 (1993).  Not every discrepancy in testimony translates into perjury.  Lambert v. Blackwell,

13 387 F.3d 210, 249 (3d Cir. 2004), cert. denied, 544 U.S. 1063 (2005).

14    Although Moore asserted he had told Leong that he had seen petitioner's face,

15 petitioner has not shown that this testimony did not arise from "confusion, mistake, or faulty

16 memory."  At one point, the trial court instructed Moore to answer the questions as asked rather

17 than to attempt to interpret them:

18         And the question asks specially whether or not you said a specific
            statement to an individual, not actually what was happening to you
19         at that point in time.  There's a difference there, what you might
            have said and actually what you remember now to be the case, to
20         be what took place.

21 RT 141-142.  This court's reading of the record bears out the trial judge's admonition: Moore did

22 appear to be interpreting many of counsel's questions, rather than answering them as asked.  In

23 addition, as Moore said, "It's in and out of my memory 'cause when you get shot that close up in

24 the face, it's going to come and go."  RT 126.  Petitioner has not borne his burden of showing

25 that Moore's testimony was not the result of confusion or faulty memory.

26 /////

1    Petitioner's attempt to show Gardner's perjury is similarly unavailing.  Although

2    he asserts that the shotgun shell does not appear on an inventory of property seized from his

3    room, he has not presented the court with a copy of the inventory nor done more than speculate

4    that Gardner lied about his participation in the search or what he found.  His evaluation of the

5    testimony is not sufficient to demonstrate prosecutorial misconduct.  See Carothers v. Rhay, 594

6    F.2d 225, 229 (9th Cir. 1979).

7    VI.  Other Crimes Evidence (Petition - Ground Four)

8        Petitioner argues that he was prejudiced by Moore's and Turner's testimony that

9    in February 1997, Moore and petitioner had argued, that petitioner had pulled a gun on Moore

10   and threatened to shoot "you and your bitch."  Pet. at 6; RT 81-82, 61-63.  The court ruled that

11   the testimony is "relevant evidence regarding identity, and intent, and motive in this matter."  RT

12   14.[5]

13       A state court's evidentiary ruling is not subject to federal habeas review unless the

14   ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

15   provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.

16   See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20

17   (9th Cir. 1991).  The same principles govern a challenge to the admission of other crimes

18   evidence; a federal court will not grant habeas relief unless the evidence was so prejudicial that it

19   rendered the trial fundamentally unfair.  Walter v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).

20       As the trial court recognized, the earlier confrontation between petitioner and

21   Moore was highly relevant on the questions of motive, identity and intent.  The federal courts

22   have approved the use of other crimes evidence for similar purposes.  United States v. Garcia-

23   Meza, 403 F.3d 364 (6th Cir. 2005) (evidence of defendant's earlier assault on his wife

24
       [5] Petitioner argues that the trial court was reluctant to admit this evidence because Turner
25   and Moore were unsure about the date.  Pet. (attachment page regarding ground four).  The
     transcript reflects that the court was concerned about the date of another incident, when petitioner
26   allegedly approached Turner's daughter with a broken bottle.  RT 14.

1 admissible to prove motive); <u>United States v. Lewis</u>, 780 F.2d 1140 (4th Cir. 1986) (evidence of

2 defendant's earlier assault of a fellow patient admissible to prove motive and identity).

3      Moreover, as the trial court recognized, the evidence was not so prejudicial as to

4 deny petitioner a fair trial.  The incident was described briefly and given a different spin by

5 petitioner.  There is no indication that the jury focused on it during its deliberations.  Petitioner

6 has not shown "gross or conspicuous prejudice" from its admission.  <u>Warden v. Wyrick</u>, 770

7 F.2d 112, 116 (8th Cir. 1985).

8 VII.  <u>Actual Innocence</u>

9      In his reply, petitioner appears to raise a claim of actual innocence, citing <u>Schlup</u>

10 <u>v. Delo</u>, 513 U.S. 298 (1995).  He supports his claim by arguing once again that "thru [sic] it's

11 eyewitness, the prosecution presented false manufactured evidence," and that the various police

12 reports showing the differences in Moore's various descriptions of the shooter "establishes

13 petitioner's actual innocence and confirms that the prosecution's eyewitness had in fact changed

14 his entire identification and tailored it to convict the petitioner."  Traverse at 20.

15      It is not proper to raise new arguments in a reply.  <u>Cacoperdo v. Demosthenes</u>, 37

16 F.3d 504, 507 (9th Cir. 1994).  Moreover, because petitioner is not relying on his innocence to

17 avoid the application of a procedural bar, it appears that he is raising a "freestanding" actual

18 innocence claim under <u>Herrera v. Collins</u>, 506 U.S. 390 (1993).  As the Ninth Circuit has

19 recognized, there is an "extraordinarily high" standard for such a claim, which requires petitioner

20 to "go beyond demonstrating doubt about his guilt and . . . affirmatively prove that he is probably

21 innocent."  <u>Boyde v. Brown</u>, 404 F.3d 1159, 1168 (9th Cir.), <u>as amended on rehearing</u>, 421 F.3d

22 1154 (2005).  His reliance on the discrepancies in Moore's descriptions of the shooter and on his

23 claim that he never limped falls far short of proving that he is probably innocent.  This claim is

24 unavailing.

25      Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

26 writ of habeas corpus be denied.

1         These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served and filed within ten days after service of the objections.  The parties are advised

7    that failure to file objections within the specified time may waive the right to appeal the District

8    Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9    DATED:  October 19, 2006.

10

11

12              UNITED STATES MAGISTRATE JUDGE

13

14    2/brow1965.157

15

16

17

18

19

20

21

22

23

24

25

26